IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID GENE LANCASTER, | ) No. C 09-3230 MMC (PR) |
| Plaintiff. | ) **ORDER DENYING PLAINTIFF'S MOTION TO COMPEL;** |
| v. | ) **GRANTING DEFENDANTS' MOTION FOR SUMMARY** |
| DR. AUNG, et al., | ) **JUDGMENT** |
| Defendants. | ) **(Docket Nos. 22, 23)** |
| _____ ) | |

On July 15, 2009, plaintiff, a California prisoner incarcerated at the Correctional Training Facility at Soledad ("CTF"), and proceeding pro se, filed the above-titled civil rights action pursuant to 42 U.S.C. § 1983, claiming deliberate indifference to his serious medical needs by CTF medical staff in 2007. Specifically, plaintiff claims defendants improperly delayed in diagnosing and treating his coccidioidomycosis, also known as "Valley Fever." Plaintiff seeks monetary damages.

Now before the Court are: (1) plaintiff's motion to compel, and (2) defendants' motion for summary judgment.

**BACKGROUND**

The following facts are drawn from plaintiff's verified complaint ("Compl.") and the parties' evidence submitted in support of and in opposition to the motion for summary judgment. The facts are undisputed unless otherwise noted.

On May 8, 2007, plaintiff requested medical services, claiming he was feeling light-headed. (Compl. at 4; Decl. J. Trent Supp. Mot. Summ. J. ("Trent Decl.") Ex. A at 15.) Defendant Physician Assistant John Trent ("P.A. Trent") examined plaintiff at 9:08 a.m. the same day. (Trent Decl. ¶ 5.) P.A. Trent noted plaintiff was in good spirits and was joking and laughing. (Id.) Plaintiff nonetheless reported that, for the prior week, he had been experiencing dizziness twice daily as well as some fainting and memory impairment. (Id.)

P.A. Trent noted plaintiff was alert and oriented, that his vital signs were stable, and that he was in no apparent distress. (Id. ¶ 6.) Plaintiff denied experiencing nausea, vomiting, diarrhea, chills, fever, chest pains, weight loss, weakness, or palpitations. (Trent Decl. Ex. A at 17.) He showed no signs of head trauma, and his pupils were equal and reactive to light. (Trent Decl. ¶ 6.) Neurologically, plaintiff appeared fine, other than: (1) one side of his throat did not rise as high as the other when P.A. Trent asked him to say "ahh," and (2) he was a little unsteady when asked to walk heel-to-toe. (Id.) P.A. Trent ordered a head CT, an EKG, a comprehensive metabolic panel, a complete blood count, a urinalysis, the medication Meclizine (to ameliorate the reported dizziness), and a routine cardiology consult to test for possible Wolff-Parkinson-White syndrome – a non-emergency heart condition that can cause rapid heart rate, dizziness, light-headedness, and fainting. (Trent Decl. ¶ 6 & Ex. A at 18-20.)

At around 12:30 p.m. the same day, plaintiff reported he had dropped a cup after losing control of his hand. (Trent Decl. ¶ 7 & Ex. A at 21-22.) A triage nurse assessed plaintiff and noted he had good grip and an absence of shaking in both hands. (Id.) Given plaintiff's previously reported dizziness and other complaints, however, P.A. Trent sent plaintiff to the emergency room at Salinas Valley Memorial Hospital ("SVMH") for emergency evaluation. (Id. ¶ 7 & Ex. A at 23.)

1    SVMH completed several of the tests ordered that morning by P.A. Trent. (Trent
2 Decl. ¶ 8 & Ex. A at 24-34.) All test results were interpreted as being within normal limits.
3 (Id.) The one exception was an EKG, which confirmed Wolff-Parkinson-White syndrome.
4 (Id.) SVMH providers medically cleared plaintiff and returned him to CTF with a diagnosis
5 of "near syncope" (i.e., near fainting). (Id.)

6    When plaintiff returned to CTF that night, a receiving nurse assessed him. (Trent
7 Decl. Ex. A at 35-36.) Plaintiff denied any pain or discomfort, and he was alert and able to
8 articulate his needs. (Id.) The nurse called the on-call physician, defendant H. Aung, M.D.
9 ("Dr. Aung"), to go over the hospital's findings. (Id.) Dr. Aung ordered the nurse to
10 coordinate a follow-up appointment for the next day and to instruct plaintiff to return to the
11 clinic if his symptoms returned. (Id.)

12    The following day, plaintiff was seen by a nurse for follow-up. (Trent Decl. Ex. A at
13 37.) Plaintiff expressed no complaints. (Id.)

14    On May 10, 2007, defendant Z. Ahmed, M.D. ("Dr. Ahmed") saw plaintiff for
15 complaints of back pain. (Decl. Z. Ahmed Supp. Mot. Summ. J. ("Ahmed Decl.") ¶ 3; Trent
16 Decl. Ex. A at 38-39.) Dr. Ahmed noted that plaintiff's CT results from two days before
17 were pending. (Ahmed Decl. ¶ 3.) He checked plaintiff's vital signs and noted they were
18 within normal limits. (Id.) He also noted plaintiff was experiencing no apparent distress and
19 had been medically cleared at an outside hospital just two days before. (Id. ¶ 5.) Dr. Ahmed
20 prescribed Robaxin for plaintiff's back pain and ordered a follow-up in one week. (Id. ¶ 3.)

21    On May 11, 2007, plaintiff was taken for a medical evaluation due to dizziness.
22 (Trent Decl. Ex. A at 40.) He was seen by defendant G. Kalisher, M.D. ("Dr. Kalisher") the
23 same day. (Decl. G. Kalisher Supp. Mot. Summ. J. ("Kalisher Decl.") ¶ 4.) Plaintiff told Dr.
24 Kalisher he had fallen on his head four days earlier while "horseplaying around." (Id. ¶ 5.)
25 He informed Dr. Kalisher he had not lost consciousness but that, since the fall, he had
26 experienced headache, fatigue, difficulty concentrating, decreased appetite, and dizziness.
27 (Id.) Dr. Kalisher noted the clear CT and hospital work-up from May 8, 2007 and concluded
28 plaintiff was experiencing post-concussion syndrome. (Id. ¶¶ 5-6.) She ordered: (1) a

1 follow-up appointment for the next day, (2) a lay-in for three days so plaintiff could rest, and
2 (3) a three-day supply of Motrin for plaintiff's discomfort. (Id. ¶ 6.) Dr. Kalisher also
3 referred plaintiff for immediate assessment with an ophthalmologist, after noting a slight
4 differentiation in plaintiff's pupils. (Id. ¶ 7.) The ophthalmologist saw plaintiff the same day
5 and detected no problems or neurological-related ground for concern. (Trent Decl. Ex. A at
6 43.)

7 When plaintiff returned to the clinic for follow-up the next day, he had no fever, and
8 his vital signs were within normal limits. (Trent Decl. Ex. A at 45-46.) Because plaintiff left
9 the clinic before being seen by a physician, however, Dr. Kalisher scheduled another follow-
10 up. (Kalisher Decl. ¶ 8.)

11 Plaintiff's next appointment was on May 14, 2007 with P.A. Trent. (Trent Decl. ¶ 15
12 & Ex. A at 48-52.) At that time, plaintiff reported unsteadiness and balance impairment.
13 (Id.) He had no fever, was alert and oriented, and had no shortness of breath or other
14 respiratory distress. (Id.) Plaintiff's neurological examination was intact, and P.A. Trent
15 noted the negative CT scan from May 8, 2007. (Id.) P.A. Trent also noted, however, that
16 plaintiff had an unsteady gait, and sent plaintiff for a second CT scan. (Id.) The second CT
17 scan, taken the same day, was negative. (Compl. at 4; Decl. Maya Pri-Tal Ohana Supp. Mot.
18 Summ. J. ("Ohana Decl.") Ex. 1 at 83:11-17.)

19 Seeking to rule out anxiety disorder, P.A. Trent also referred plaintiff to the
20 psychiatric department for evaluation. (Trent Decl. ¶ 16.) The evaluation was made on
21 May 18, 2007, at which time the psychiatrist, Dr. Levin, who is not a defendant, diagnosed
22 conversion disorder, suggesting plaintiff's symptoms were psychological in origin. (Trent
23 Decl. ¶ 16 & Ex. A at 65; Decl. Harold W. Orr Supp. Mot. Summ. J. ("Orr Decl.") ¶¶ 30-31.)

24 On May 16, 2007, plaintiff complained of dizziness and received a medical visit.
25 (Trent Decl. Ex. A at 54-56.) The triage nurse detected no signs of trauma. (Id.) Plaintiff
26 was alert and oriented, verbally responsive, not feverish, and he denied blurred vision. (Id.)
27 Plaintiff was to be seen by defendant I. Grewal, M.D. ("Dr. Grewal") but was taken for a CT
28 scan before Dr. Grewal could see him. (Id.; Decl. I. Grewal Supp. Mot. Summ. J. ("Grewal

4

Decl.") ¶¶ 3, 7.)

The CT scan showed evidence of hydrocephalus, i.e., fluid buildup in the brain. (Trent Decl. Ex. A at 76.) The scan also showed the condition likely was "communicating hydrocephalus," meaning there was no visible blockage in the flow of cerebrospinal fluid. (Id.; Orr Decl. ¶ 27.) The radiology report recommended further evaluation through an MRI. (Trent Decl. Ex. A at 76.)

Although the CT scan was completed on May 16, 2007, the radiology report interpreting the results was not completed until May 24, 2007. (Trent Decl. ¶ 19.) The report subsequently was forwarded to CTF with no indication any potentially urgent problem existed. (Id.) Pursuant to custom and practice, results indicating urgent or potentially urgent problems are marked as such. (Id.) Because the report was not so marked, it was placed in P.A. Trent's mailbox and was not brought to the attention of any other CTF care providers. (Id.) P.A. Trent did not receive the report until his next rotation at CTF, which occurred on May 30, 2007. (Id.)

In the meantime, on May 17, 2007, plaintiff had additional lab work done. (Orr Decl. ¶ 28; Trent Decl. Ex. A at 59-61.) The results showed a normal white blood cell count, such that significant infection was not a concern. (Id.) Although the results did show slightly lowered lymphocytes and slightly raised granulocytes, which can be caused by bacterial and viral infections, the levels were not sufficient to trigger concern (id.), and T. Friedrichs, M.D., who is not a defendant, ordered a follow-up to review the lab results on May 28, 2007 (Trent Decl. Ex. A at 75).

On May 18, 2007, plaintiff submitted a medical care services request form in which he reported incontinence, vomiting, leg weakness, and right shoulder pain. (Trent Decl. Ex. A at 62-64.) That same day, Physician Assistant D. Decker, who is not a defendant, admitted plaintiff to CTF's Outpatient Housing Unit ("OHU") for closer monitoring. (Id. at 66-71.) On May 21, 2007, plaintiff asked to be returned to his cell. (Id.) On that date, his neurological examination was intact, he moved well, and he denied complaints of headache, dizziness, imbalance, vomiting, or reduced appetite. (Id.) He was released back to his

5

1 regular housing. (Id.)

2 On May 23, 2007, plaintiff was brought to the medical clinic after reportedly fainting
3 in his cell. (Trent Decl. Ex. A at 72-74.) He was seen by Dr. Ahmed. (Id.) He had no fever,
4 nausea, or vomiting, and was alert, responsive, and in no apparent distress. (Id.) His
5 neurological examination was normal. (Id.) Plaintiff denied having any problems. (Ahmed
6 Decl. ¶ 7.) Plaintiff also told Dr. Ahmed his cellmate had overreacted by calling the officers.
7 (Id.; Trent Decl. Ex. A at 74.) Plaintiff was able to get up out of the gurney and walk to a
8 bed alone; he also was able to walk to Dr. Ahmed's office unassisted. (Ahmed Decl. ¶ 7.)
9 Dr. Ahmed noted plaintiff's prior clear CT scan from May 14, 2007 as well as the May 17,
10 2007 testing that appeared normal. (Id.) After plaintiff remained in the treatment area
11 without incident, Dr. Ahmed returned plaintiff to his cell. (Id.) Dr. Ahmed also referred
12 plaintiff for a psychiatric follow-up. (Id.)

13 On May 30, 2007, P.A. Trent received the CT report from the May 16, 2007 scan,
14 showing evidence of hydrocephalus. (Trent Decl. ¶ 19 & Ex. A at 76-78.) He immediately
15 ordered an MRI. (Id.)

16 On May 31, 2007, plaintiff reportedly fainted. (Trent Decl. Ex. A at 79-82.) His
17 temperature was normal, but he was disoriented and had urinary incontinence. (Id.) Plaintiff
18 was referred to Dr. Ahmed who immediately sent plaintiff to the hospital. (Id.)

19 In the hospital, doctors conducted various tests and monitored plaintiff for several
20 days before eventually transferring plaintiff to another hospital for placement of a shunt on
21 June 5, 2007, to alleviate fluid-related pressure. (Trent Decl. Ex. A at 83-100.) On June 11,
22 2007, outside doctors ultimately diagnosed plaintiff with coccidiodomycosis and started him
23 on antifungal medication. (Id. at 101-06.)

24 Coccidiodomycosis is a fungal infection predominantly caused by inhaling fungal
25 particles found in alkaline soils in semi-arid areas, such as California's San Joaquin Valley.
26 (Orr Decl. ¶ 3.) For this reason, it is commonly called "Valley Fever." (Id.) It is a rare
27 infection, with only about .0005% of Americans contracting it annually. (Id.)

28 In an estimated 60-65% of cases, Valley Fever, causes no symptoms. (Id. ¶ 4.) In the

6

1 remaining 35-40% of cases, Valley Fever causes only flu-like illness. (Id.) Valley Fever
2 spreads beyond the lungs, i.e., becomes "disseminated," in only about 0.6% of cases. (Id.)

3 Disseminated Valley Fever usually occurs weeks to months after initial infection. (Id.
4 ¶ 5.) Dissemination can affect most areas of the body including the skin, bones, liver, brain,
5 and heart, which makes Valley Fever notoriously difficult to diagnose. (Id.)

6 One area that can be affected by disseminated Valley Fever is the membrane covering
7 the brain. (Id. ¶ 6.) The resulting inflammation, also called meningitis, has a clinical
8 presentation that can manifest in diverse ways. (Id.) The disease process is slow and
9 unpredictable. (Id.) While fungus can cause a rapidly progressive acute meningitis, some
10 forms will lead to a more indolent chronic infection that progresses slowly. (Id.) Common
11 symptoms include those characteristic of numerous other medical problems, e.g., headache,
12 nausea, and vomiting. (Id.)

**DISCUSSION**

I. Plaintiff's Motion to Compel

Plaintiff has filed a motion to compel discovery from a third party, specifically CTF Correctional Officer Heller. Officer Heller worked in the wing in which plaintiff was housed in May 2007. (Mot. to Compel at 1.) Plaintiff asserts Officer Heller informed plaintiff that he had placed a memorandum in plaintiff's inmate file, expressing his concern about plaintiff's medical symptoms. (Id.) Plaintiff states he has been unable to locate such memorandum in his prison files and requests that Officer Heller be compelled to disclose information documenting plaintiff's medical issue. (Id. at 1-2.)

There is no indication plaintiff has submitted either (1) a discovery request under rules 26-37 of the Federal Rules of Civil Procedure, or (2) a third-party subpoena to the Court for service, under Federal Rule of Civil Procedure 45. Further, plaintiff fails to certify that he has fulfilled the meet and confer requirement under Federal Rule of Civil Procedure 37(a)(1) and Northern District of California Civil Local Rule 37-1(a).

Accordingly, plaintiff's motion to compel will be denied.

II.     Defendants' Motion for Summary Judgment

     A.     Legal Standard

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See id.

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Id. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" See id. at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv., Inc., v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A verified complaint may be used as an opposing affidavit under Rule 56, provided it is based on personal knowledge and sets forth specific facts admissible in evidence. See

Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated, under penalty of perjury, contents were true and correct, and allegations were not based purely on information and belief but rather on personal knowledge).

### B. Deliberate Indifference to Serious Medical Needs

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). "A determination of 'deliberate indifference' involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." Id. (citing Estelle v. Gamble, 429 U.S. at 104). A prison official is deliberately indifferent if he knows a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." Id. Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. See McGuckin, 974 F.2d at 1060.

A claim of medical malpractice or negligence is insufficient to make out a violation of the Eighth Amendment. Id. at 1059. Nor does "a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment" amount to deliberate indifference. Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). Consequently, a plaintiff's opinion that medical treatment was unduly delayed does not, without more, state a claim of deliberate indifference. Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.

9

1985). Rather, in order to prevail on a claim based on delayed treatment, a plaintiff must show the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that such treatment was chosen "in conscious disregard of an excessive risk to plaintiff's health." See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

C. Analysis

Plaintiff alleges CTF medical staff were deliberately indifferent to his serious medical needs in that they failed to treat his Valley Fever from May 8, 2007, when he received medical care for light-headedness and loss of hand control, to May 31, 2007, when he was sent to an outside hospital for treatment.[1] Defendants concede plaintiff had a serious medical need. (Orr Decl. ¶ 6.) The record, however, amply demonstrates defendants provided plaintiff adequate care.

As discussed above, the vast majority of plaintiff's lab tests and physical examinations showed plaintiff's vital signs and neurological function to be normal and showed no infection requiring treatment. Indeed, the first two of plaintiff's three CT scans came back negative. Although plaintiff ultimately was diagnosed with Valley Fever-related meningitis requiring treatment, he has not shown he was denied appropriate medical attention in the days leading up to such diagnosis. To the contrary, the evidence shows defendants regularly monitored and assessed plaintiff's condition and recommended treatment according to his clinical presentation. As discussed above, during the approximately one month preceding plaintiff's diagnosis, plaintiff received at least twelve healthcare visits, five lab tests (including complete blood and metabolic screenings), three CT scans, an EKG, two psychiatric assessments, an ophthalmological assessment, an order for a three-day lay-in, three different medications, a three-day observational stay in the OHU, a referral for an MRI, and three visits to outside hospitals. Nor were plaintiff's complaints ignored by CTF staff, who promptly saw plaintiff on the same day he submitted each of his requests for medical

---

[1] Plaintiff has made no allegations with respect to his symptoms and/or medical treatment prior to May 8, 2007, and, in particular, does not claim he needed or requested medical care or that defendants deliberately ignored his needs prior to such date.

10

1 services, regularly ordered lab testing and made referrals in response thereto, and regularly
2 scheduled follow-up appointments. Plaintiff's radiology results did not indicate a need for
3 further follow-up by way of an MRI until his third CT scan. Defendants promptly ordered
4 that MRI immediately upon receiving the radiology results on May 30, 2007. Defendants
5 have submitted a declaration from Harold W. Orr, M.D. ("Dr. Orr"), stating his opinion that
6 defendants' actions were medically appropriate and met the standard of care for treatment of
7 patients with coccidioidomycosis and meningitis. (Orr Decl. ¶¶ 2, 9, 13, 14, 16, 17, 19, 22,
8 24, 35-38.) Plaintiff has failed to come forward with specific facts to support a finding to the
9 contrary, let alone a finding of deliberate indifference to his medical needs.

10 To the extent plaintiff argues defendants had a duty to diagnose and treat his Valley
11 Fever as soon as symptoms emerged in early May 2007, such argument fails. The evidence
12 shows plaintiff was moved to the hospital on May 31, 2007, had surgery for placement of a
13 shunt on June 5, 2007, and was successfully diagnosed on June 11, 2007, amounting to a
14 delay in diagnosis of slightly over one month from the time plaintiff first sought treatment on
15 May 8, 2007. There is no evidence such interval was in any manner attributable to
16 defendants' deliberate indifference to plaintiff's condition. To the contrary, the evidence
17 demonstrates that during the period of treatment at issue, defendants were constantly
18 searching for a root cause of plaintiff's symptoms. In addition to their own examinations,
19 defendants immediately ordered and followed up on the results of outside scans and
20 specialist consults.

21 Indeed, there is no evidence from which the duration of such interval can be deemed
22 "medically unacceptable under the circumstances" see Jackson, 90 F.3d at 332, particularly
23 given the complex clinical picture plaintiff presented. Rather, defendants have submitted
24 evidence, Dr. Orr's declaration, in which he states that plaintiff's particular condition was
25 difficult to diagnose in light of: (1) plaintiff's positive testing for Wolff-Parkinson-White
26 syndrome; (2) plaintiff's reports of having injured his head; (3) plaintiff's "evolving
27 constellation of symptoms"; (4) plaintiff's clear CT scans; (5) the indications of a psychiatric
28 component to plaintiff's symptoms; and (6) the "protean nature" of Valley Fever-related

11

meningitis in general. (Orr Decl. ¶ 39.) Again, plaintiff fails to come forward with specific facts to support a finding to the contrary, and, as discussed, there is no evidence that defendants acted with deliberate indifference.

Considering the evidence in the light most favorable to plaintiff, the Court finds plaintiff has failed to raise a triable issue of material fact as to whether defendants were deliberately indifferent to plaintiff's serious medical needs. Accordingly, summary judgment will be granted as to all defendants.

## CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. Plaintiff's motion to compel is hereby DENIED.

2. Defendants' motion for summary judgment is hereby GRANTED.

3. The Clerk shall enter judgment in favor of all defendants and close the file.

This order terminates Docket Numbers 22 and 23.

IT IS SO ORDERED.

DATED: April 18, 2012

MAXINE M. CHESNEY
United States District Judge